UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No: _06- 80158- CR- Ryskamp/ Hopkins_ .

18 U.S.C. § 371
18 U.S.C. § 1341
18 U.S.C. § 1343
18 U.S.C. § 1346
18 U.S.C. § 981(a)(1)(C)
21 U.S.C. § 853
28 U.S.C. § 2461

UNITED STATES OF AMERICA,
             Plaintiff,

vs.

ANTHONY R. MASILOTTI,
             Defendant.
_____/



FILED by _____ D.C.

OCT 27 2006

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

## INFORMATION

The United States Attorney charges that:

## GENERAL ALLEGATIONS

At all times relevant to this Information:

*The County and Local Governments.*

1.     The Palm Beach County Board of County Commissioners ("BCC") was the legislative and policy-setting body of County government in Palm Beach County, in the Southern District of Florida. Seven Commissioners are elected from single-member districts to staggered four-year terms to represent the entire County.

2.     The Martin County Commission ("Martin Commission"), was the legislative and policy-setting body of County government in Martin County, in the Southern District of Florida.

3.     At varying times and places in Palm Beach and Martin Counties, the BCC and the Martin Commission held joint meetings concerning recurring issues that affected both counties.

4.     The Village of Wellington ("Wellington") and the Village of Royal Palm Beach ("Royal Palm Beach") were municipalities located within Palm Beach County.

5.     Palm Beach County employs a county attorney, county administrator and county engineer. They, in turn, each supervise numerous lower-level staff who are charged with the responsibility of discharging their respective mandates and missions.

6.     The county engineer has several divisions assigned to him. One of those divisions is the Traffic Division, which had its own manager who answered to the county engineer. The traffic division manager supervised several engineers who are responsible for the county-wide implementation of the Traffic Performance Standards which control the traffic patterns, volume, and capacity on all Palm Beach county roadways.

*The Restoration of the Everglades and the Loxahatchee River.*

7.     The South Florida Water Management District ("SFWMD"), is a 16-county regional agency of the State of Florida, charged with managing and protecting water resources of the region by balancing and improving water quality, flood control, natural systems and water supply. SFWMD's boundaries extend from central Florida to Monroe County, and from the Gulf Coast to the Atlantic Ocean, including Lake Okeechobee, the Everglades, the Florida Keys and Florida Bay. SFWMD's boundaries extended to the Loxahatchee River basin in Palm Beach and Martin Counties, and the SFWMD was responsible in part for the preservation and restoration of the water resources of the Everglades and Loxahatchee River as part of its overall environmental mission.

2

8.      Beginning in or around 2000, the United States Congress created the Comprehensive Everglades Restoration Plan ("CERP"). CERP comprised a partnership of the United States Army Corps of Engineers, the SFWMD, and many other federal, state, and local partners which cooperated in the restoration of the Everglades.

9.      As a significant part of its overall environmental mission, the SFWMD is funded by the State of Florida and the United States which allowed the SFWMD to purchase land. These land purchases were designed, in part, for the purpose of the restoration of the natural flow of the Everglades and the Loxahatchee River. The SFWMD has created a land acquisition section staffed by attorneys and support personnel in furtherance of its land purchase mission.

10.     The SFWMD appeared regularly before the BCC, made presentations, sought land use changes, alterations and easements, and provided information critical to the citizenry. The SFWMD maintained a fully-staffed office and headquarters in West Palm Beach, Palm Beach County, Florida.

11.     The SFWMD has a Governing Board, comprised of nine individuals separately appointed by the governor, and whose vote was required on all land acquisitions and expenditures of public funds. The Board also appointed an executive director who supervised the day-to-day operations of the SFWMD, including its land acquisition section.

12.     In or about 1989, the State of Florida created the Florida Communities Trust ("FCT") to help local governments meet the need to preserve green space and natural areas throughout the State of Florida. As part of its mission, the FCT was funded to purchase real estate in areas designated as environmentally sensitive.

3

13.    In or about 1999, the Florida Legislature created the Florida Forever program which authorized borrowing money through bond issues, in an amount not to exceed \$3 billion over a 10-year period, for the acquisition of land and water which money was provided to the FCT to use in acquiring land and water resources for preservation purposes. At various times, the FCT has used money generated from the Florida Forever program in connection with state and local government land purchases related to the CERP.

14.    Both the BCC and Martin Commission were also allocated funds from state and federal sources for the purpose of purchasing environmentally sensitive land. In Martin County, the source of those funds came through the Healthy Rivers Fund.

15.    Due to the joint desire and mission of these agencies and governments to preserve environmentally sensitive land, especially lands in the Everglades and near the Loxahatchee River flowing through Palm Beach and Martin Counties, they often became partners in land acquisitions and joined resources to purchase large tracts of environmentally-sensitive land.

16.    Cypress Creek was a critical element in the multi-agency effort, which included the SFWMD, Palm Beach County, and Martin County to increase freshwater flow to the Northwest Fork of the Loxahatchee River as it flowed through each of those counties. The Cypress Creek watershed included both developed and undeveloped parcels of real property in both Palm Beach and Martin Counties. One particular parcel of land within the Cypress Creek watershed was an approximate 3,500 acre undeveloped parcel variously known as Pal-Mar East, Nine Gems, Bridge Property, and NineJem ("hereinafter Nine Gems"), which parcel was situated wholly within Martin County in the Southern District of Florida. This parcel was within the CERP-designated area as desirable land to purchase in furtherance of the Everglades and Loxahatchee River restoration mission.

4

*Land Use and Development and the Land Holders.*

17.     Land use, zoning and related issues all must be resolved before development of any parcel of real estate in Palm Beach County. Those issues were controlled by the particular municipalities in which the land was situated, or by the BCC if the land was situated in unincorporated Palm Beach County.

18.     The resolution of traffic concurrence by the Traffic Division of the Palm Beach County Engineering Department was required prior to the development of any parcel of real estate in Palm Beach County. The county resolved every traffic concurrence issue irrespective of whether the parcel of real estate being contemplated for development was located within, or outside of, any particular municipality.

19.     The Roman Catholic Diocese of Palm Beach ("Diocese") was the local organizational and governing authority of the Roman Catholic Church. Its scope and area of control covered all Roman Catholic Churches and assets, including real estate assets, situated in Palm Beach County, Martin County, and elsewhere.

20.     The Diocese owned an approximate 50-acre tract of undeveloped real estate which was located within Royal Palm Beach, Palm Beach County, Florida. This tract of land had the appropriate land use designation for residential development but lacked the required county-issued traffic concurrence.

21.     Palm Beach Aggregates ("Aggregates") was a land holding and mining company located in Palm Beach County. As part of its real estate holdings, it owned a 1,200 acre parcel of undeveloped real estate in unincorporated Palm Beach County which bordered on Wellington. This

5

land lacked the required land use, zoning and traffic concurrence necessary for residential development.

22.     Lennar Homes ("Lennar") was a major residential homebuilder in Palm Beach County and elsewhere. Lennar was involved in negotiations with Aggregates over the purchase of its 1,200 acre tract for future residential development at that site.

23.     GL Homes ("GL Homes") was a major residential homebuilder in Palm Beach County. GL Homes built Nautica Lakes, a residential subdivision located on the former Diocese property in Royal Palm Beach.

24.     Black Diamond Nursery ("Black Diamond") was an approximate 230-acre nursery located in Palm Beach County. Black Diamond was annexed into Wellington and then was sold to Centerline Homes for the building of residential homes by December 2000.

25.     Palm Beach county owned an approximate 10 acre parcel of real estate near Belvedere Road and State Road 7 ("SR 7") at which location they leased space for the maintenance, sheltering and use of a mounted patrol. This property was known as the "Posse Property."

26.     In 2003, the BCC decided to issue a Request for Proposal ("RFP"), under which the county would sell the Posse Property. The RFP was advertised and sealed bids were received. The bids were reviewed by a BCC-selected committee and the BCC then voted on the winning bid.

27.     Palm Beach County owned an approximate 10 acre parcel of real estate near Belvedere Road and State Road 7 ("SR 7") at which location they leased space for the maintenance, sheltering and use of a mounted patrol. This property was known as the "Posse Property."

28.     J.L. and D.L., persons known to the United States Attorney, were the owners of Black Diamond Nursery and obtained the necessary land use, zoning and traffic concurrence required for

6

sale of their unimproved real estate to Centerline Homes. They subsequently bought the Nine Gems tract, sold it to the SFWMD, and became partners in the purchase of the Diocese property, obtained the necessary traffic concurrency from the county, and subsequently sold that property to GL Homes.

29.     E.A.T., a person known to the United States Attorney, was the President and part owner of Aggregates. E.A.T. lobbied for the annexation of the 1,200 acre Aggregates tract into Wellington and then successfully leveraged that contemplated annexation into the receipt of favorable land use and zoning concessions from the BCC, which made the Aggregates tract suitable for residential development.

30.     B.A.R., a person known to the United States Attorney, was the Chief Executive Officer and President of the Rendina Companies, a multi-million dollar company which primarily developed and built medical office buildings and space in Palm Beach County.

31.     H.E.O., a person known to the United States Attorney, was an attorney licensed to practice law in the State of Florida and was a partner in the law firm Gunster, Yoakley & Stewart, P.A. ("Gunster, Yoakley"), located in West Palm Beach and Stuart, Florida. H.E.O. specialized in the handling of real estate transactions and related matters. H.E.O. represented J.L. and D.L. in the Nine Gems purchase and sales transactions.

32.     D.N.M., a person known to the United States Attorney, was a civil engineer and businessman variously associated with KDM Properties, and Community Preservation of Palm Beach County, Inc. D.N.M.'s business activities included the negotiation of contracts to purchase land and the sale of those contracts to developers.

33.     W.R.B., a person known to the United States Attorney, was an attorney licensed to practice law in the State of Florida and was a named partner in the law firm Boose, Casey, Ciklin,

Lubitz, Martens, McBane & O'Connell ("Boose law firm"), located in West Palm Beach, Florida. W.R.B. specialized in land use and zoning laws and regularly appeared before the BCC seeking approval of land use, zoning and other real estate-related matters on behalf of his clients.

34.     W.R.B.'s law firm also served as bond counsel for the BCC and received compensation from Palm Beach County for its work in that area.

35.     P.F.M., a person known to the United States Attorney, was the brother of defendant ANTHONY R. MASILOTTI and, beginning in or around November 2003, was a building inspector for Wellington and took and executed an oath of office for Wellington in which he swore to uphold the Constitutions of the United States of America and State of Florida.

*The Defendant.*

36.     In or around November 1998, and again in or around November 2002, defendant ANTHONY R. MASILOTTI was elected to separate four-year terms as a Palm Beach County Commissioner for District 6 which District covered the western portions of Palm Beach County, including Wellington and Royal Palm Beach.

37.     On or about November 6, 1998, and again on or about November 7, 2002, defendant ANTHONY R. MASILOTTI took and executed an oath of office swearing to uphold the Constitutions and Governments of the United States of America and State of Florida.

38.     As a sworn public official, defendant ANTHONY R. MASILOTTI had a legal and ethical responsibility to perform his duties free from fraud, self-enrichment and self-dealing.

39.     Besides being an elected public official, defendant ANTHONY R. MASILOTTI, owned and operated a Royal Palm Beach-based State Farm Insurance Agency.

8

## COUNT 1
## (Conspiracy, (18 U.S.C. §§ 371, 1341, 1343, 1346, and 26 U.S.C. §7212))

40.    The United States Attorney re-alleges and incorporates herein by reference the General Allegations Section of this Information.

41.    From an exact time unknown to the United States Attorney, but at least as early as in or around October 2000, and continuing through in or around June 2006, at Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

### ANTHONY R. MASILOTTI,

did knowingly and willfully combine, conspire, confederate, agree and reach a tacit understanding with at least one other person known and unknown to the United States Attorney, to commit offenses against the United States, that is,

(a) to knowingly and willfully devise a scheme and artifice to deprive another of the intangible right of defendant ANTHONY R. MASILOTTI's honest services, and, for the purpose of executing this scheme and artifice, to knowingly use and cause to be used the United States mails or private or commercial interstate carriers, and did knowingly cause to be transmitted in interstate and foreign commerce by means of wire communications certain signals and sounds, in violation of Title 18, United States Code, Sections 1341, 1343 and 1346; and

(b) to corruptly impede the Internal Revenue Service in the due administration of Title 26, United States Code, that is, in the ascertainment, assessment and collection of federal personal income taxes due and owing by defendant ANTHONY R. MASILOTTI for calendar year 2004, in violation of Title 26, United States Code, Section 7212.

9

## OBJECT OF THE CONSPIRACY

42.    It was the object of the conspiracy to unjustly enrich defendant ANTHONY R. MASILOTTI and others and to deprive the citizenry of defendant MASILOTTI's duty of honest services by having defendant MASILOTTI use his position to advance ventures and relationships in which he had a concealed financial interest and to continue to conceal those financial interests and relationships.

43.    It was a further object of the conspiracy that defendant ANTHONY R. MASILOTTI endeavored by himself, and with others, to corruptly impede and impair the Internal Revenue Service from the accurate ascertainment, assessment and collection of federal personal income taxes due and owing from defendant MASILOTTI for calendar year 2004.

## MANNER AND MEANS OF THE CONSPIRACY

44.    Defendant ANTHONY R. MASILOTTI used his publicly-elected position to persuade and coerce, and attempt to persuade and coerce, the Diocese of Palm Beach to sell its real estate holdings located in Royal Palm Beach to D.N.M. while defendant MASILOTTI concealed his true financial interest and relationship with D.N.M..

45.    Defendant ANTHONY R. MASILOTTI assisted, and attempted to assist, his land investment partners J.L., D.L., and D.N.M. before various Wellington and Royal Palm Beach officials and the Palm Beach County Engineer with regard to certain land use, zoning and traffic concurrency issues without disclosing to those officials that he had a concealed financial interest with those individuals in both the Nine Gems parcel as well as in the Diocese property.

10

46.     D.N.M., under false and fraudulent pretenses, failed to disclose to the Palm Beach County Engineer's office that defendant ANTHONY R. MASILOTTI had a concealed financial interest in the Diocese land deal with him.

47.     E.A.T. gave a concealed financial interest in 60 acres of the 1,200 acre Aggregates tract to defendant ANTHONY R. MASILOTTI through P.F.M.

48.     Defendant ANTHONY R. MASILOTTI used his publicly-elected position to publicly and privately advocate to Wellington officials and in the BCC, and to vote on in the BCC, favorable land use and zoning concessions for the 1,200 acre Aggregates tract within which he had a concealed financial interest.

49.     Once the appropriate land use and zoning changes were achieved for the 1,200 acre Aggregates tract, defendant ANTHONY R. MASILOTTI and P.F.M. swapped their interest in the 60 acres of Aggregates land, for which they previously had paid $100,000, for land in Brevard County worth approximately $7.7 million.

50.     Defendant ANTHONY R. MASILOTTI used his publicly-elected position to advocate for, and vote for in the BCC, the B.A.R. acquisition of the Posse Property, without revealing that he had received tens of thousands of dollars worth of travel and other gifts by and through B.A.R.

51.     Defendant ANTHONY R. MASILOTTI, D.N.M., and W.R.B. made materially false statements to federal investigators regarding their true financial relationship with each other and with the Nine Gems and Diocese tracts.

11

## OVERT ACTS

In furtherance of the above-described conspiracy and to advance the objects thereof, the defendant and other co-conspirators committed one or more of the following overt acts, among others:

## Nine Gems

52.     After previous governmental denials against J.L. and D.L., on or about January 5, 2000, defendant ANTHONY R. MASILOTTI advocated to the county engineer for a favorable traffic concurrence resolution for J.L. and D.L. with respect to the Black Diamond Nursery property.

53.     On or about October 14, 2000, defendant ANTHONY R. MASILOTTI gave J.L. and D.L. $25,000 to secure his investment in 100 acres of the Nine Gems tract at a final cost equal to the contract price paid by J.L. and D.L. Defendant ANTHONY R. MASILOTTI made clear to J.L. and D.L. that his financial interest in Nine Gems must remain concealed at all times.

54.     On or about November 21, 2000, defendant ANTHONY R. MASILOTTI used his publicly-elected position and advocated for J.L. and D.L. before Wellington with respect to certain remaining density issues regarding the Black Diamond Nursery tract without revealing his concealed financial relationship with them in the Nine Gems tract.

55.     In or about January 2001, J.L. and D.L. purchased the approximate 3500-acre Nine Gems tract in the names of corporate entities for approximately $7.9 million through the assistance of their attorney, H.E.O., who drafted the documents and intentionally concealed any reference to defendant ANTHONY R. MASILOTTI having any beneficial or legal ownership interest in any part of the Nine Gems tract.

12

56.     By February 2002, defendant ANTHONY R. MASILOTTI gave J.L. and D.L. an additional $250,000 to secure his financial interest in the Nine Gems parcel.

57.     In or around August 2002, defendant ANTHONY R. MASILOTTI hired W.R.B. to represent him in the creation of a Trust designed to conceal defendant MASILOTTI's contemplated purchase of a tract of land from J.L. and D.L. at Nine Gems.

58.     W.R.B. engaged in this financial relationship with defendant ANTHONY R. MASILOTTI at a greatly discounted rate despite both defendant MASILOTTI's ability to pay and W.R.B.'s frequent appearances before the BCC seeking favorable votes from defendant MASILOTTI and the BCC on various land use matters.

59.     On or about August 28, 2002, W.R.B. created a land trust naming Richard B. Crum as "Trustee" ("the Crum Trust"), and defendant ANTHONY R. MASILOTTI named his then-wife, S.L.M. as the beneficial owner of the Crum Trust. Richard B. Crum was an accountant at the Boose law firm.

60.     On or about September 28, 2002, through the Crum Trust, defendant ANTHONY R. MASILOTTI purchased 150 acres of the Nine Gems tract from J.L. and D.L. in both a location and at a price much more favorable than other investors in the Nine Gems tract.

61.     To further hide defendant ANTHONY R. MASILOTTI's financial interest, defendant MASILOTTI and W.R.B. caused S.L.M. to personally write the checks for the balance of the monies owed in a total amount of approximately $98,000 despite the fact that the earlier monies were paid personally by defendant MASILOTTI.

62.     In or around May 2003, after K.L., an employee of Martin County known to the United States Attorney, contacted W.R.B. regarding Martin County and the FCT's desire to purchase

13

the Nine Gems tract, W.R.B. had Richard B. Crum execute a willingness to sell statement without revealing to K.L. and the FCT the true owner of the Crum Trust. The other owners of the Nine Gems parcel, including J.L. and D.L., all signed similar statements indicating their willingness to enter into negotiations with Martin County and the FCT.

63.     On or about July16, 2003, defendant ANTHONY R. MASILOTTI participated in a joint meeting of the BCC and the Martin Commission in Jupiter, Florida. During this meeting, defendant MASILOTTI utilized his publicly-elected position and had K.L. make a presentation to the public regarding her desire to purchase the Nine Gems tract on behalf of Martin County and the FCT for environmental purposes. Defendant MASILOTTI further urged K.L. to seek additional funding from the SFWMD, whose funding was necessary to make the purchase of the Nine Gems parcel. Defendant MASILOTTI withheld and concealed from K.L., his fellow BCC commissioners, the Martin County officials, and the public, his personal financial interest in the Nine Gems property.

64.     On or about August 21, 2003, defendant ANTHONY R. MASILOTTI appeared at a meeting at the SFWMD Headquarters in West Palm Beach which meeting included SFWMD officials, Martin County officials, J.L., and D.L. and concerned the negotiations for the purchase of the Nine Gems tract by the SFWMD. At this meeting, defendant MASILOTTI again used his publicly-elected position and argued in favor of, and endorsed, the SFWMD purchase of the Nine Gems parcel without revealing to those officials and the public that he had a personal financial interest in the Nine Gems property.

65.     At or around the same time period, defendant ANTHONY R. MASILOTTI called K.L. and again advocated for the purchase of the Nine Gems tract by Martin County, the FCT and the SFWMD without revealing to K.L. his concealed financial interest in the Nine Gems parcel.

14

66.    In or around November 2003, defendant ANTHONY R. MASILOTTI continued to use his official position and advocated to SFWMD officials the favorable aspects of their contemplated purchase of the Nine Gems parcel without revealing his true financial interest in the contemplated transaction.

67.    On or about November 20, 2003, at the request of the SFWMD, H.E.O. caused blank beneficial interest affidavits to be forwarded to all Nine Gems parcel owners, including J.L, D.L., MLCI Realty, Inc., W.M., a person known to the United States Attorney, and W.R.B. on behalf of the Crum Trust.  After receiving executed affidavits from D.L., MLCI Realty, Inc., and W.M., H.E.O. failed to forward the completed affidavits to the SFWMD.

68.    On or about November 25, 2003, H.E.O. caused a materially false electronic mail transmission to be made to the SFWMD concerning the beneficial owners of the Crum Trust, who were falsely identified as J.L. and D.L.

69.    In or around late November or early December 2003, W.R.B. contacted J.L. directly and attempted to persuade J. L. to buy out S.L.M., the stated beneficial owner of the Crum Trust, in order to conceal defendant ANTHONY R. MASILOTTI's financial interest from the SFWMD.

70.    In or around January, 2004, J.L., D.L., W.R.B., and defendant ANTHONY R. MASILOTTI, through the Crum Trust, informed the SFWMD of their desire to retain certain acreage on the roadway of Seminole Pratt Whitney Road (SR 711), which abutted the western side of the Nine Gems tract, and was the only paved roadway in the area.

71.    On or about March 15, 2004, H.E.O. caused a facsimile cover sheet and communication to be sent from Gunster, Yoakley to the SFWMD which attached a proposed Option Agreement contract for review and again included the Crum Trust property in the sale to SFWMD.

15

72.     Beginning in or around March 2004, W.R.B. conferred with H.E.O., J.L., and D.L. about the necessity to continue to conceal defendant ANTHONY R. MASILOTTI's concealed financial interest in the Nine Gems parcel. Defendant MASILOTTI, along with W.R.B., H.E.O., and others decided to perform a land swap that resulted in J.L. and D.L. purchasing the Crum Trust property slated to be sold to the SFWMD and exchanged it for approximately 150 acres of J.L. and D.L.-retained road frontage to the north of the Crum Trust property. As a result, the Crum Trust, and its true beneficial owner would remain concealed from the public.

73.     On or about March 22, 2004, H.E.O. caused a facsimile cover sheet to be sent to the SFWMD and copied to W.R.B., MLCI Realty, Inc., and W.M. which informed them that the Crum Trust was being bought out by J.L. and D.L. and that "the Crum Trust is no longer party to the deal with the SFWMD."

74.     On or about either March 22, 2004 or March 25, 2004, defendant ANTHONY R. MASILOTTI, W.R.B., H.E.O., J.L., and D.L. participated in a telephone conference call after which the land swap scheme was implemented. During this call, defendant MASILOTTI used his position and threatened to obstruct the SFWMD transaction if J.L. and D.L. did not agree to the proposed land swap. Defendant MASILOTTI further insisted that J.L. and D.L. pay the $50,000 in closing costs necessary to effect this swap. Finally, defendant MASILOTTI, W.R.B., and H.E.O. agreed that J.L. and D.L. would be given an option to purchase back 110 acres of the land they were swapping with defendant MASILOTTI and defendant MASILOTTI insisted that he be allowed to pick any of the remaining 40 acres he wished on the SR 711 roadway.

16

75.     On or about March 29, 2004, defendant ANTHONY R. MASILOTTI, W.R.B., H.E.O., J.L., and D.L. caused the land swap and option to purchase agreements between J.L., D.L., and the Crum Trust to be executed.

76.     On or about March 29, 2004, H.E.O., J.L., and D.L. executed the Option Agreement with the SFWMD.

77.     On or about July 13, 2004, defendant ANTHONY R. MASILOTTI voted in the BCC to award W.R.B. as Palm Beach County's bond counsel for a $50 million bond offering and related legal matters without disclosing that W.R.B. was the attorney handling defendant MASILOTTI's financial interests in the Nine Gems transactions and was performing that service at a substantially discounted rate.

78.     On or about October 27, 2004, defendant ANTHONY R. MASILOTTI, through representatives of the Boose law firm, conveyed a threat to cause problems in future SFWMD closings on the Nine Gems parcel if he was prevented from choosing the 40 acres he wanted to keep as a result of the previous land swap.

79.     In or around April 2005, J.L. and D.L. exercised their option to purchase back 110 acres of defendant ANTHONY R. MASILOTTI's 150 acres of land for $14,000 an acre.

80.     On or about April 11, 2005, H.E.O. wire transferred $1.7 million to W.R.B., which monies represented the purchase price for the 110 acres defendant ANTHONY R. MASILOTTI sold to J.L. and D.L.

81.     On or about April 12, 2005, W.R.B. wire transferred $1.7 million to defendant ANTHONY R. MASILOTTI, which monies represented the purchase price for the 110 acres defendant MASILOTTI sold to J.L. and D.L.

17

82.    From in or around May 2005 and continuing through in or around December 2005, defendant ANTHONY R. MASILOTTI used the proceeds of the Nine Gems sale to cause the purchase of thirteen (13) separate certificates of deposit in the amount of $100,000 each, in the names of various family members.

83.    On or about April 24, 2006, W.R.B. caused Richard B. Crum to execute a transfer of the remaining 40 acres of the Crum Trust real property to S.L.M.

84.    On or about May 22, 2006, defendant ANTHONY R. MASILOTTI caused S.L.M. to quit claim deed the remaining 40 acre road front parcel in the Nine Gems tract to defendant MASILOTTI as part of his divorce settlement agreement with S.L.M.

85.    In or around June 2006, W.R.B. created a false and fraudulent billing statement designed to cover his agreement to provide free legal services to defendant ANTHONY R. MASILOTTI in connection with this matter which bill was directed to S.L.M. and attempted to coalesce four years of work on this matter into a bill for a total of 9.3 hours of legal services.

### Diocese Property

86.    On or about November 8, 2002, defendant ANTHONY R. MASILOTTI met with W.S., a person known to the United States Attorney, and advocated for W.S.'s partnership with D.N.M. in the purchase and residential development of the Diocese property. At that time, defendant MASILOTTI further represented to W.S. that D.N.M. and T.C., an individual known to the United States Attorney, represented defendant MASILOTTI's interest in the Diocese property.

87.    On or about January 16, 2003, acting in the role of County Commissioner, defendant ANTHONY R. MASILOTTI, along with W.S., met with officials of the Roman Catholic Diocese of Palm Beach concerning the potential sale and residential development of the Diocese property.

18

At this meeting, defendant MASILOTTI concealed his true financial interest in this contemplated land purchase.

88.     In or around February, 2003, defendant ANTHONY R. MASILOTTI contacted D.P.L., a person known to the United States Attorney and a representative of the Diocese of Palm Beach, and utilized his publicly-elected position and advocated for the sale of the Diocese property to defendant D.N.M. and to W.S. Defendant MASILOTTI concealed his true financial interest in the contemplated purchase of the Diocese property from D.P.L.

89.     On or about March 6, 2003, defendant ANTHONY R. MASILOTTI caused the Village Manager for Royal Palm Beach to send to defendant MASILOTTI a letter requesting defendant MASILOTTI's assistance in the securing of a park for the citizens of Royal Palm Beach from the sale of the Diocese property to a developer.

90.     On or about April 22, 2003, acting in the role of County Commissioner, defendant ANTHONY R. MASILOTTI and D.N.M. met with officials of the Roman Catholic Diocese of Palm Beach concerning the Diocese property. At this meeting, defendant MASILOTTI and D.N.M. concealed defendant MASILOTTI's true financial interest in this contemplated land purchase.

91.     On or about April 22, 2003, defendant ANTHONY R. MASILOTTI signed a letter as Commissioner to then Bishop O'Malley of the Diocese publicly advocating for the sale of the Diocese property to a developer who would ensure that a public park be built for the enjoyment of the citizens of Royal Palm Beach. Defendant MASILOTTI attached the letter from the Village Manager of Royal Palm Beach which had been created at defendant MASILOTTI's insistance. Defendant MASILOTTI concealed from Royal Palm Beach and Diocese officials his financial interest with D.N.M. in the Diocese property.

19

92.    On or about July 21, 2003, after the Diocese of Palm Beach sent out a notice of bids for the Diocese property and sent a bid package to defendant ANTHONY R. MASILOTTI and D.N.M., defendant MASILOTTI sent a letter on official County stationary to D.P.L. in which he falsely denied any financial interest in the Diocese property.

93.    On or about July 28, 2003, D.N.M., through Community Preservation of Palm Beach County, Inc., submitted an approximate $6 million bid for the purchase of the Diocese property and promised to build a park for the citizens of Royal Palm Beach.

94.    On or about August 17, 2003, D.N.M., through Community Preservation of Palm Beach County, Inc., amended and increased his bid for the purchase of the Diocese property upward to $7 million and continued to promise the building of a park for the citizens of Royal Palm Beach.

95.    On or about August 18, 2003, defendant ANTHONY R. MASILOTTI, acting as a publicly-elected commissioner, called D.P.L. and told D.P.L. that, unless the Diocese selected the developer who promised to build a park and guarantee a certain density of residential development, defendant MASILOTTI would ensure that the desired residential developmental density was not achieved.

96.    On or about August 26, 2003, D.N.M.'s $7 million bid and promise to build a park for the citizens of Royal Palm Beach, submitted through Community Preservation of Palm Beach County, Inc., was accepted by the Diocese. D.N.M.'s bid was the only bid which met the oral conditions set by defendant ANTHONY R. MASILOTTI. At or about the time of signing the purchase agreement, D.N.M. received $50,000 from T.C., which money was to be sent to the Diocese as a deposit required under the contract.

97.    In or about October 2003, D.N.M. contacted D.L. in an attempt to persuade D.L. to become partners with D.N.M. in the Diocese property as T.C. was no longer interested in pursuing the contract. D.L. contacted defendant ANTHONY R. MASILOTTI, who endorsed D.N.M. and the transaction.

98.    On or about November 1, 2003, D. L. and J. L. bought out T. C. and became partners in Community Preservation of Palm Beach County, Inc., with D.N.M. in the Diocese property purchase.

99.    On or about November 7, 2003, D.N.M. caused Community Preservation of Palm Beach County, Inc. to sign an agreement with GL Homes to purchase the Diocese property contract.

100.    On or about November 20, 2003, defendant ANTHONY R. MASILOTTI and D.N.M. met with a principal of a GL Homes-retained engineering firm in an attempt to resolve traffic concurrence issues which would prevent full residential development of the Diocese property.

101.    On or about November 24, 2003, defendant ANTHONY R. MASILOTTI and D.N.M. met with the chief engineer of Palm Beach County to resolve the traffic concurrence issues which would prevent full residential development of the Diocese property by GL Homes. Defendant MASILOTTI made statements in his official capacity without disclosing to the chief engineer that defendant MASILOTTI had a financial interest in the Diocese property or that he had a financial relationship with D.L. and J.L. in the Nine Gems tract.

102.    On or about February 6, 2004, after receiving the proceeds from the sale of the Diocese property from GL Homes, D.N.M. wire transferred $50,000 to a bank account which serviced the Atlantis Hotel and Casino in Nassau, Bahamas.

21

103. On or about February 6, 2004, defendant ANTHONY R. MASILOTTI and D.N.M. traveled to Nassau, Bahamas to effectuate the transfer of the money which represented part of defendant MASILOTTI's financial interest in the Diocese property transaction. This transaction, caused by defendant MASILOTTI, was conducted for the purpose of paying defendant MASILOTTI for his assistance to D.N.M. in the Diocese land transaction and generated income to defendant MASILOTTI in a manner that effectively concealed from the Internal Revenue Service defendant MASILOTTI's receipt of income. This transaction constituted an act intended to corruptly impair and impede the Internal Revenue Service from the accurate ascertainment, assessment and collection of federal personal income taxes owed by defendant MASILOTTI for taxable year 2004.

104. On or about February 17, 2004, D.N.M. delivered to J.L. a check in the amount of $451,600, which money represented 50% of the profits from the flip of the Diocese property contract to GL Homes.

## Palm Beach Aggregates

105. Beginning in or around August 2003, E.A.T. met with Wellington officials in order to determine Wellington's willingness to annex the approximate 1,200 acre Aggregates tract located in unincorporated Palm Beach County and subsequently re-zone that tract for residential development which would substantially increase its value.

106. On or about January 15, 2004, defendant ANTHONY R. MASILOTTI and P.F.M. caused ARM Family Land Trust, an entity that did not legally exist, to sign a contract with E.A.T. for an Option to Purchase 60 acres of land located within the larger 1,200 acre tract owned by Palm Beach Aggregates. This Option Agreement required ARM Family Land Trust to pay $100,000 for

22

the right to buy the 60 acres for $1.8 million within 3 years. The Option was not recorded in the public records.

107.    In or around January 2004, defendant ANTHONY R. MASILOTTI used his official position and met with Wellington officials and advocated for the annexation of Aggregates-held land, including the 1,200 acre tract, into Wellington. During this meeting, defendant MASILOTTI failed to disclose both his and his brother's financial interest in the 1,200 acre Aggregates tract.

108.    On or about February 6, 2004, defendant ANTHONY R. MASILOTTI and P.F.M. caused ARM Family Land Trust to be legally created by R.A.D., a Royal Palm Beach-based attorney known to the United States Attorney.

109.    On or about February 25, 2004, defendant ANTHONY R. MASILOTTI, utilized his publicly-elected position and advocated to Wellington officials for the annexation of the 1,200 acre Aggregates tract into Wellington and the attendant favorable land use and zoning concessions necessary for residential development. During this meeting, defendant MASILOTTI failed to disclose both his and his brother's financial interest in the 1,200 acre Aggregates tract.

110.    On or about February 26, 2004, defendant ANTHONY R. MASILOTTI voted in the BCC on modifying Aggregates land use conditions and failed to disclose both his and his brother's financial interest in the 1,200 acre Aggregates tract.

111.    On or about March 24, 2004, defendant ANTHONY R. MASILOTTI transferred $50,000 to P.F.M..

112.    On or about March 30, 2004, P.F.M. gave R.A.D. $100,000, which money was placed into escrow in R.A.D.'s trust account, and which represented the cost of the Option required under

23

the ARM Family Land Trust agreement with Aggregates that had been signed on or about January 15, 2004.

113.    On or about April 2, 2004, defendant ANTHONY R. MASILOTTI, utilized his publicly-elected position and advocated to Wellington officials for the annexation of the 1,200 acre Aggregates tract into Wellington and the attendant favorable land use and zoning concessions necessary for residential development. During this meeting, defendant MASILOTTI failed to disclose both his and his brother's financial interest in the 1,200 acre Aggregates tract.

114.    On or about April 13, 2004, defendant ANTHONY R. MASILOTTI, acting as County Commissioner, appeared before the Wellington Council and publicly lobbied in favor of Wellington's annexation of 1,200 acres owned by Palm Beach Aggregates. During this hearing, defendant MASILOTTI failed to disclose both his and his brother's financial interest in the 1,200 acre Aggregates tract.

115.    On or about April 22, 2004, defendant ANTHONY R. MASILOTTI, acting as a commissioner before the BCC, voted in favor of allowing Aggregates favorable land use and zoning concessions in order to prevent Wellington's annexation of Aggregates land and other land situated west of Aggregates. During this hearing, defendant MASILOTTI failed to disclose to the public both his and his brother's financial interest in the 1,200 acre Aggregates tract.

116.    In or around the Fall of 2004, defendant ANTHONY R. MASILOTTI, P.F.M., and D.L. traveled to Micco, Brevard County, Florida to view an approximate 300 acre tract of real estate which was for sale.

117.    In or around the Fall of 2004, defendant ANTHONY R. MASILOTTI, E.A.T., and D.L. traveled to Micco, Brevard County, Florida to view the same 300 acre tract of property, which

24

E.A.T. later caused to be purchased for approximately $7.7 million through Micco Eastern Holdings, LLC in or around February 2005.

118.    On or about April 28, 2005, four months after the BCC finally approved land use changes that substantially increased the value of the 1,200 acre Aggregates tract, and one month after E.A.T. secured a $300,000,000 contract from Lennar Homes on the 1,200 acre Aggregates tract, defendant ANTHONY R. MASILOTTI and P.F.M. caused ARM Family Land Trust to release back to Aggregates its unrecorded Option to buy the 60 acres of land. The 60 acres was then sold by the Aggregates to Lennar Homes as part of the overall 1,200 acre tract of land.

119.    On or about May 3, 2005, in exchange for the release of the $100,000 Option, Palm Beach Aggregates assigned all its rights in Micco Eastern Holdings, LLC, to ARM Family Land Trust, thereby transferring ownership of the $7.7 million Brevard County property to defendant ANTHONY R. MASILOTTI and P.F.M..

## Posse Property

120.    On or about May 18, 2003, defendant ANTHONY R. MASILOTTI flew at no expense on charter aircraft rented to B.A.R., a person known to the United states Attorney, from Nassau, Bahamas to West Palm Beach, Florida.

121.    On or about October 8, 2003, B.A.R. submitted a bid of $2.8 million to purchase the Posse property.

122.    On October 17, 2003 and October 19, 2003, P.F.M. flew at no expense on charter aircraft rented to B.A.R. round trip from West Palm Beach, Florida to Nassau, Bahamas.

123.    On or about December 5, 2003 and December 7, 2003, defendant ANTHONY R. MASILOTTI, his brother, P.F.M., and R.H., a person known to the United states Attorney and a

25

friend of defendant ANTHONY R. MASILOTTI, flew at no expense on charter aircraft rented to B.A.R. round trip from West Palm Beach, Florida to Providence, Rhode Island.

124.    On or about January 10, 2004, defendant ANTHONY R. MASILOTTI flew at no expense on charter aircraft rented to B.A.R. from Nassau, Bahamas to West Palm Beach, Florida.

125.    On or about January 13, 2004, defendant ANTHONY R. MASILOTTI, acting as a commissioner before the BCC, voted to accept B.A.R.'s bid for commercial development of the Posse property over the bid of Lennar Homes, a residential developer. Defendant MASILOTTI failed to disclose his concealed financial relationship and substantial gifts from B.A.R.

126.    On or about March 25, 2004, defendant ANTHONY R. MASILOTTI's ex-wife S.L.M., and two children, flew at no expense on charter aircraft rented to B.A.R. from Nassau, Bahamas to West Palm Beach, Florida.

127.    On or about April 27, 2004, B.A.R. sent a letter to Palm Beach County regarding B.A.R.'s purchase of the Posse property.

128.    On or about July 12, 2004, defendant ANTHONY R. MASILOTTI met with Palm Beach County officials and discussed the Posse Property purchase by B.A.R. and failed to disclose his concealed financial relationship and substantial gifts from B.A.R.

129.    On or about October 27, 2004, B.A.R. sent a letter to Palm Beach County regarding B.A.R.'s purchase of the Posse property.

130.    On or about January 12, 2005, defendant ANTHONY R. MASILOTTI flew at no expense on charter aircraft rented to B.A.R. from West Palm Beach, Florida to Nassau, Bahamas.

131.    On or about February 15, 2005, defendant ANTHONY R. MASILOTTI, acting as a commissioner before the BCC, voted to accept the contract between the Palm Beach County and

26

B.A.R. for purchase of the Posse property. Defendant ANTHONY R. MASILOTTI again failed to disclose his concealed financial relationship and substantial gifts from B.A.R.

132.    On or about October 16, 2005, defendant ANTHONY R. MASILOTTI, and his brother, P.F.M. flew at no expense on charter aircraft rented to B.A.R. from Nassau, Bahamas to West Palm Beach, Florida.

All in violation of Title 18, United States Code, Section 371.

## CRIMINAL FORFEITURE

Upon conviction of the violations alleged in Count 1 of this Information, defendant,

## ANTHONY R. MASILOTTI,

shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to the violations including, but not limited to, the following:

a.    The sum of $9,500,000 in United States currency.

b.    All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located in Martin County, Florida, and more particularly described as:

A Parcel of Land Lying in Section 8, Township 40 South, Range 41 East, Martin County, Florida, being more particularly described as follows:

Commence at the southwest corner of said section 8; thence south 89°41'03" east, along the south line of said section 8, a distance of 492.30 feet to the point of beginning, said point being on the southeast right-of-way line of Seminole Pratt-Whitney road; thence north 30° 56'10" east, along said southeast right-of-way line, a distance of 1290.67 feet to a point on a line 1110.70 feet north of and parallel with the south line of said section 8; thence south 89°41'03" east, along said line parallel with the south line of section 8, a distance of 1568.74 feet to a point on a line 1350.00 feet southeast of and parallel to said southeast right-of-way line of Seminole Pratt-Whitney road; thence south 30°56'10" west, along said line parallel with the southeast right-of-way line of Seminole Pratt-Whitney road, a distance of 1290.67 feet to a point on the south line of said section 8;thence north 89°41'03" west, along said south line of section 8, a distance of 1568.74 feet to the point of beginning.

27

Containing 40.00 acres, more or less.

c.     All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located in Brevard County, Florida, with tax account numbers 3010494, 3010495, 3001886, and more particularly described as:

### Parcel 1

Parcel 1 ("Parcel 1 ") being a portion of the following parent parcel (the "Parent Parcel") of real property lying North of Micco Road, Brevard County, Florida:

Parent Parcel: A parcel of land lying in the SE 1/4 of Section 8, Sections 17 and 18, the South ½ of Section 18, all in Township 30 South, Range 38 East, Brevard County, Florida and the SE 1/4 of Section 13, Township 30 South, Range 37 East, and part of the George Fleming Grant, Plat Book 2, Page 25, public records of Brevard County, Florida, being more particularly described as follows:

Begin at the NE corner of the said SE 1/4 of said Section 8; thence run S 00°05'44"W, along the East line of said SE 1/4, 2676.75 feet to the South right-of-way line of Micco Road; thence S 89°33'04" E along said right-of-way line, a distance of 305.44 feet; thence S 00°27'40"W along the center line of a drainage ditch, a distance of 5525.79 feet to a point on the easterly extension of the South line of said Section 18; thence N 89° 52'32" W along said easterly extension, a distance of 7195.59 feet to a 3" iron pipe at the intersection of an old barbed wire fence at the intersection of the South line of said Section 18 and the Northwest line of the said George Fleming Grant; thence continue N 89° 52' 32" W along the south line of said Section 18 a distance of 3421.49 feet to the Southwest corner of said Section 18; thence N 89°54'09" W along the South line of said Section 13, T30S, R37E, a distance of 2709.27 feet to the SW corner of the SE 1/4 of said Section 13; thence run N 00° 08' 46" W, along the West line of the SE 1/4 of said Section 13, a distance of 2645.08 feet to the South right-of-way line of Micco Road; thence N 89° 29' 46" E along said South R/W line, a distance of 2660.88 feet; thence continue along said South right-of-way line, N 89°03'25" E, a distance of 5134.02 feet; thence N 00° 03'36" along the West line of said Section 17, a distance of 2715.58 to the Northwest corner of said Section 17; thence run N 89° 15'29" E along the north line of said Section 17, a distance of 2659.00 feet to the South 1/4 corner of said Section 8; thence N 00°10' 27" W along the West line of the SE 1/4 of said Section 8, a distance of 2643.82 feet to the center of said Section 8; thence run N 89° 20'29" E along the North line of the SE 1/4 of said Section 8, a distance of 2634.74 feet to the point of beginning.

Parcel 1: Being a portion of the above described Parent Parcel more particularly described as: Begin at an old 4" square concrete monument with a 2" brass disk centered, occupying and being the NW corner of the partial Section 17, Township 30 S, Range 38 E, Brevard County, Florida and run N 89° 14'55" E, a distance of 2658.04' to an identical concrete monument occupying and being the NE corner of the NW 1/4 of said Section 17; run thence N 00° 10'00" W, a distance of 2643.71'

to a 4" square monument with rebar as center lying on the South side of a canal spoil bank approximately 1' above the ground, said monument occupying and being the NW corner of the SE 1/4 of Section 8, Township 30 South, Range 38 East; run thence N 89° 21'47" E, a distance of 2596.93' to a 5/8" rebar #4889 that lies 1' East of a 4' tall, 4-strand barbed-wire fence running to the South, and lies S 89° 20'46" W, a distance of 55.56' from an old 4" square-concrete monument with a small pin at center, said monument occupying and being the NE corner of the said SE 1/4 from said rebar run thence S 00°33'18", parallel to and 1' East of said fence, a distance of 1200.90 feet to the intersection of the East line of the said SE 1/4 with the Fleming Grant line; thence continue S 00° 33'18" W, a distance of 1373.47' to the North line of Micco Road, a 100' right-of-way; run thence N 89° 18'28" W, along the said North right-of-way line, a distance of 1394.61' to a 5/8" rebar #4889 to turn in the right-of-way line said rebar lying 50' NW of by perpendicular measurement of the said Fleming Grant line; run thence S 44° 35'48" W, parallel to and 50' West of said Fleming Grant line, a distance of 3828.14 feet to a point 50' NW of by perpendicular measurement from the Fleming Grant line and is 2590 feet by perpendicular measurement from the North line of the said NW 1/4 of said Section 17; run thence S 89°14'55" W, parallel to and 2590 feet South of said North line, along the said North right-of-way line, S 89° 14'55" W, a distance of 1137.04' to the intersection of the said North right-of-way line with the west line of the said NW 1/4 of said Section 17; thence run N 00° 03'36 W a distance of 2590 feet to the point of beginning containing 297.76 acres, more or less and lying and being in Sections 17 and 8, T30S, R38E, and the Fleming Grant, Brevard County, Florida.

## Parcel 2

Parcel 2 ("Parcel 2") being all that real property in the SE 1/4 of Section 8, Township 30 South, Range 38 East, Brevard County, Florida, and the George Fleming Grant, Plat Book 2, Page 25, public records of Brevard County, Florida, lying east of the easternmost line, and contiguous therewith, of Parcel 1 described below, more particularly described herein as Parcel 2:

Parcel 1 ("Parcel 1 ") being a portion of the following parent parcel (the "Parent Parcel") of real property lying North of Micco Road, Brevard County, Florida:

Parent Parcel: A parcel of land lying in the SE 1/4 of Section 8, Sections 17 and 18, the South 1/2 of Section 18, all in Township 30 South, Range 38 East, Brevard County, Florida and the SE 1/4 of Section 13, Township 30 South, Range 37 East, and part of the George Fleming Grant, Plat Book 2, Page 25, public records of Brevard County, Florida, being more particularly described as follows: Begin at the NE corner of the said SE 1/4 of said Section 8; thence run S 00°05'44"W, along the East line of said SE 1/4, 2676.75 feet to the South right-of-way line of Micco Road; thence S 89°33'04" E along said right-of-way line, a distance of 305.44 feet; thence S 00°27'40"W along the center line of a drainage ditch, a distance of 5525.79 feet to a point on the easterly extension of the South line of said Section 18; thence N 89° 52'32" W along said easterly extension, a distance of 7195.59 feet to a 3" iron pipe at the intersection of an old barbed wire fence at the intersection of the South line of said Section 18 and the Northwest line of the said George Fleming Grant; thence continue N 89° 52' 32" W along the south line of said Section 18 a distance of 3421.49 feet to the Southwest corner

of said Section 18; thence N 89°54'09" W along the South line of said Section 13, T30S, R37E, a distance of 2709.27 feet to the SW corner of the SE 1/4 of said Section 13; thence run N 00° 08' 46" W, along the West line of the SE 1/4 of said Section 13, a distance of 2645.08 feet to the South right-of-way line of Micco Road; thence N 89° 29' 46" E along said South R/W line, a distance of 2660.88 feet; thence continue along said South right-of-way line, N 89°03'25" E, a distance of 5134.02 feet; thence N 00° 03'36" along the West line of said Section 17, a distance of 2715.58 to the Northwest corner of said Section 17; thence run N 89° 15'29" E along the north line of said Section 17, a distance of 2659.00 feet to the South 1/4 corner of said Section 8; thence N 00°10' 27" W along the West line of the SE 1/4 of said Section 8, a distance of 2643.82 feet to the center of said Section 8; thence run N 89° 20'29" E along the North line of the SE 1/4 of said Section 8, a distance of 2634.74 feet to the point of beginning.

Parcel 1: Being a portion of the above described Parent Parcel more particularly described as: Begin at an old 4" square concrete monument with a 2" brass disk centered, occupying and being the NW corner of the partial Section 17, Township 30 S, Range 38 E, Brevard County, Florida and run N 89° 14'55" E, a distance of 2658.04' to an identical concrete monument occupying and being the NE corner of the NW 1/4 of said Section 17; run thence N 00° 10'00" W, a distance of 2643.71' to a 4" square monument with rebar as center lying on the South side of a canal spoil bank approximately 1' above the ground, said monument occupying and being the NW corner of the SE 1/4 of Section 8, Township 30 South, Range 38 East; run thence N 89° 21'47" E, a distance of 2596.93' to a 5/8" rebar #4889 that lies 1' East of a 4' tall, 4-strand barbed-wire fence running to the South, and lies S 89° 20'46" W, a distance of 55.56' from an old 4" square-concrete monument with a small pin at center, said monument occupying and being the NE corner of the said SE 1/4 from said rebar run thence S 00°33'18", parallel to and 1' East of said fence, a distance of 1200.90 feet to the intersection of the East line of the said SE 1/4 with the Fleming Grant line; thence continue S 00° 33'18" W, a distance of 1373.47' to the North line of Micco Road, a 100' right-of-way; run thence N 89° 18'28" W, along the said North right-of-way line, a distance of 1394.61' to a 5/8" rebar #4889 to turn in the right-of-way line said rebar lying 50' NW of by perpendicular measurement of the said Fleming Grant line; run thence S 44° 35'48" W, parallel to and 50' West of said Fleming Grant line, a distance of 3828.14 feet to a point 50' NW of by perpendicular measurement from the Fleming Grant line and is 2590 feet by perpendicular measurement from the North line of the said NW 1/4 of said Section 17; run thence S 89°14'55" W, parallel to and 2590 feet South of said North line, along the said North right-of-way line, S 89° 14'55" W, a distance of 1137.04' to the intersection of the said North right-of way line with the west line of the said NW 1/4 of said Section 17; thence run N 00° 03'36 W a distance of 2590 feet to the point of beginning containing 297.76 acres, more or less and lying and being in Sections 17 and 8, T30S, R38E, and the Fleming Grant, Brevard County, Florida.

Parcel 2: Being all that real property in the SE 1/4 of Section 8, Township 30 South, Range 38 East, Brevard County, Florida, and the George Fleming Grant, Plat Book 2, Page 25, public records of Brevard County, Florida, lying east of the easternmost line, and contiguous therewith, of Parcel 1 described above, more particularly described as follows: Begin at a 5/8" rebar #2866 "Gordon" at the POB or those lands described in ORB 2978, Page 3751, and run thence S00°06'04"

W, along the first call line of deed in said ORB, a distance of 2575.45' to the North R/W line of Micco Road (100' R/W); run thence N89°18'28" W, along the said North R/W line, a distance of 60.95' to a point on said R/W line 1.0 feet East of an existing 4 strand barbed wire fence; thence departing said R/W line, run thence N00°33'18" E, parallel to and 1.0' East of said fence a distance of 2574.37' to a point on the North line of the SE 1/4 of Section 8, T30S, R38E, Brevard County, Florida; run thence N89°20'46" E, along said North line, a distance of 40.54 feet to the point of beginning, containing 3.0 acres +\-.

## Parcel 3

Parcel 3 ("Parcel 3") being all that real property in the SE 1/4 of Section 8, Township 30 South, Range 38 East, Brevard County, Florida, and the George Fleming Grant, Plat Book 2, Page 25, public records of Brevard County, Florida, lying east of the easternmost line, and contiguous therewith, of Parcel 2 described below, more particularly described herein as Parcel 3:

Parcel 1 ("Parcel 1 ") being a portion of the following parent parcel (the "Parent Parcel") of real property lying North of Micco Road, Brevard County, Florida:

Parent Parcel: A parcel of land lying in the SE 1/4 of Section 8, Sections 17 and 18, the South ½ of Section 18, all in Township 30 South, Range 38 East, Brevard County, Florida and the SE 1/4 of Section 13, Township 30 South, Range 37 East, and part of the George Fleming Grant, Plat Book 2, Page 25, public records of Brevard County, Florida, being more particularly described as follows: Begin at the NE corner of the said SE 1/4 of said Section 8; thence run S 00°05'44"W, along the East line of said SE 1/4, 2676.75 feet to the South right-of-way line of Micco Road; thence S 89°33'04" E along said right-of-way line, a distance of 305.44 feet; thence S 00°27'40"W along the center line of a drainage ditch, a distance of 5525.79 feet to a point on the easterly extension of the South line of said Section 18; thence N 89° 52'32" W along said easterly extension, a distance of 7195.59 feet to a 3" iron pipe at the intersection of an old barbed wire fence at the intersection of the South line of said Section 18 and the Northwest line of the said George Fleming Grant; thence continue N 89° 52' 32" W along the south line of said Section 18 a distance of 3421.49 feet to the Southwest corner of said Section 18; thence N 89°54'09" W along the South line of said Section 13, T30S, R37E, a distance of 2709.27 feet to the SW corner of the SE 1/4 of said Section 13; thence run N 00° 08' 46" W, along the West line of the SE 1/4 of said Section 13, a distance of 2645.08 feet to the South right-of-way line of Micco Road; thence N 89° 29' 46" E along said South R/W line, a distance of 2660.88 feet; thence continue along said South right-of-way line, N 89°03'25" E, a distance of 5134.02 feet; thence N 00° 03'36" along the West line of said Section 17, a distance of 2715.58 to the Northwest corner of said Section 17; thence run N 89° 15'29" E along the north line of said Section 17, a distance of 2659.00 feet to the South 1/4 corner of said Section 8; thence N 00°10' 27" W along the West line of the SE 1/4 of said Section 8, a distance of 2643.82 feet to the center of said Section 8; thence run N 89° 20'29" E along the North line of the SE 1/4 of said Section 8, a distance of 2634.74 feet to the point of beginning.

Parcel 1: Being a portion of the above described Parent Parcel more particularly described as: Begin at an old 4" square concrete monument with a 2" brass disk centered, occupying and being the NW corner of the partial Section 17, Township 30 S, Range 38 E, Brevard County, Florida and run N 89° 14'55" E, a distance of 2658.04' to an identical concrete monument occupying and being the NE corner of the NW 1/4 of said Section 17; run thence N 00° 10'00" W, a distance of 2643.71' to a 4" square monument with rebar as center lying on the South side of a canal spoil bank approximately 1' above the ground, said monument occupying and being the NW corner of the SE 1/4 of Section 8, Township 30 South, Range 38 East; run thence N 89° 21'47" E, a distance of 2596.93' to a 5/8" rebar #4889 that lies 1' East of a 4' tall, 4-strand barbed-wire fence running to the South, and lies S 89° 20'46" W, a distance of 55.56' from an old 4" square-concrete monument with a small pin at center, said monument occupying and being the NE corner of the said SE 1/4 from said rebar run thence S 00°33'18", parallel to and 1' East of said fence, a distance of 1200.90 feet to the intersection of the East line of the said SE 1/4 with the Fleming Grant line; thence continue S 00° 33'18" W, a distance of 1373.47' to the North line of Micco Road, a 100' right-of-way; run thence N 89° 18'28" W, along the said North right-of-way line, a distance of 1394.61' to a 5/8" rebar #4889 to turn in the right-of-way line said rebar lying 50' NW of by perpendicular measurement of the said Fleming Grant line; run thence S 44° 35'48" W, parallel to and 50' West of said Fleming Grant line, a distance of 3828.14 feet to a point 50' NW of by perpendicular measurement from the Fleming Grant line and is 2590 feet by perpendicular measurement from the North line of the said NW 1/4 of said Section 17; run thence S 89°14'55" W, parallel to and 2590 feet South of said North line, along the said North right-of-way line, S 89° 14'55" W, a distance of 1137.04' to the intersection of the said North right-of way line with the west line of the said NW 1/4 of said Section 17; thence run N 00° 03'36 W a distance of 2590 feet to the point of beginning containing 297.76 acres, more or less and lying and being in Sections 17 and 8, T30S, R38E, and the Fleming Grant, Brevard County, Florida.

Parcel 2: Being all that real property in the SE 1/4 of Section 8, Township 30 South, Range 38 East, Brevard County, Florida, and the George Fleming Grant, Plat Book 2, Page 25, public records of Brevard County, Florida, lying east of the easternmost line, and contiguous therewith, of Parcel 1 described above, more particularly described as follows: Begin at a 5/8" rebar #2866 "Gordon" at the POB or those lands described in ORB 2978, Page 3751, and run thence S00°06'04" W, along the first call line of deed in said ORB, a distance of 2575.45' to the North R/W line of Micco Road (100' R/W); run thence N89°18'28" W, along the said North R/W line, a distance of 60.95' to a point on said R/W line 1.0 feet East of an existing 4 strand barbed wire fence; thence departing said R/W line, run thence N00°33'18" E, parallel to and 1.0' East of said fence a distance of 2574.37' to a point on the North line of the SE 1/4 of Section 8, T30S, R38E, Brevard County, Florida; run thence N89°20'46" E, along said North line, a distance of 40.54 feet to the point of beginning, containing 3.0 acres +\-.

Parcel 3: Being all that real property in the SE1/4 of Section 8, Township 30 South, Range 38 East, Brevard County, Florida, and the George Fleming Grant, Plat Book 2, Page 25, public records of Brevard County, Florida, lying east of the easternmost line, and contiguous therewith, of Parcel 2 described above, more particularly described as follows: Begin at a 5/8" rebar #2866

"Gordon" at the POB or those lands described in ORB 2978, Page 3751, and run thence S 00°06'04" W along the first call line of deed in said ORB, a distance of 2575.45' to the North R/W line of Micco Road (100' R/W); run thence S 89°18'28" E, along the said North R/W line, a distance of 23.61' to a point on said R/W line and on the true East line of the SE 1/4 said Section 8; thence departing said R/W line run thence N 00°05'17" E, a distance of 2575.91' to an old 4" square concrete monument occupying and being the true NE corner of the SE 1/4 of Section 8, T30S, R38E, Brevard County, Florida; run thence S 89° 20'46" W, along said North line, a distance of 15.12 feet to the point of beginning, containing 1.14 acres +\-.

Together with any and all other real property in the SE1/4 of Section 8, Township 30 South, Range 38 East, Brevard County, Florida, and the George Fleming Grant, Plat Book 2, Page 25, public records of Brevard County, Florida, lying east of the easternmost line of Parcel 1 described above, and north of Micco Road.

    d.    All interest in Micco Eastern Holdings, LLC, EIN: 20-2897958.

    e    All interest in ARM Family Land Trust.

    f    All interest in State Farm Bank account #1009396109 held in the name of defendant

ANTHONY R. MASILOTTI.

    g    All interest in Certificate of Deposits held at Fidelity Federal Bank account ##7200020177, 7200020185, and 7200020207.

    h    All interest in Certificate of Deposits held at Washington Mutual Bank account ##18200012625686 and 18200012625694.

Pursuant to Title 28, United States Code, Section 2461, Title 18, United States Code, Section 981(a)(1)(C), and Title 21, United States Code, Section 853.

If the property described above as being subject to forfeiture, as a result of any act or omission of the defendant,

**ANTHONY R. MASILOTTI,**

(1)    cannot be located upon the exercise of due diligence;

(2)    has been transferred or sold to, or deposited with a third person;

33

(3)     has been placed beyond the jurisdiction of the Court;

(4)     has been substantially diminished in value; or

(5)     has been commingled with other property which cannot be subdivided
        without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) to seek

forfeiture of any other property of the defendant up to the value of the above forfeitable property

and, in addition, to require said defendant to return any such property to the jurisdiction of the court

for seizure and forfeiture, including but not limited to:

a.      All that lot or parcel of land, together with its buildings, appurtenances,

improvements, fixtures, attachments and easements, located at 9609 Worswick Court, Wellington,

Florida, and more particularly described as:

Lot 358, Block J of OLYMPIA PLAT 1, according to the Plat thereof, as recorded
in Plat Book 93, page 135, of the Public Records of Palm Beach County, Florida.

b.      All that lot or parcel of land, together with its buildings, appurtenances,

improvements, fixtures, attachments and easements, located in Okeechobee County, Florida, and

particularly described as follows:

The West One-Half (W ½) of the East One-Half (E ½) of the North One-Half (N ½)
of the North One-Half (N ½) of Tract 5, Section 14, Township 34 South, Range 33
East, Okeechobee County, Florida, according to the Plat Thereof, as recorded in Plat
Book 4, at Pages 3 A-D, inclusive, of the Public Records of Okeechobee County,
Florida. (14-5-B).

c.      All interest in A.R. Masilotti Insurance Agency, Inc., EIN: 65-0122021.

d.      All interest in Bonefish Creek, Ltd., Marina BB, LLC, Hotel BB, LLC, Airport BB,

LLC, and Lot Sales BB, LLC.

e.      All interest in 4 Girls 2 Boys, LLC.

34

    f.     All interest in Boys 4 Girls 2, LLC.

    g.    All interest in For Boys To Girls, Ltd. (IBC).

    h.    All interest in Boys N Girls, Ltd. (IBC).

    i.     All interest in Bank of Bahamas account #1302557, held in trust by Maillis and

Maillis, Counsel and Attorneys-at-Law, Fort Nassau House, Marlborough Street, Nassau, Bahamas,

for defendant ANTHONY R. MASILOTTI, Boys 4 Girls 2, LLC, 4 Girls 2 Boys, LLC, For Boys To

Girls, Ltd. (IBC), or Boys N Girls, Ltd. (IBC) regarding a development on Cat Island, Bahamas

known as Bonefish Creek, Ltd., Marina BB, LLC, Hotel BB, LLC, Airport BB, LLC, and Lot Sales

BB, LLC.

    All pursuant to Title 28 United States Code, Section 2461, Title 18, United States Code,

Section 981(a)(1)(C), and Title 21 United States Code, Section 853.


R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY


JOHN S. KASTRENAKES
ASSISTANT UNITED STATES ATTORNEY


STEPHEN CARLTON
ASSISTANT UNITED STATES ATTORNEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NO. _06-80158-CR- Ryskamp / Hopkins._ |
| vs. | **CERTIFICATE OF TRIAL ATTORNEY** * |
| ANTHONY R. MASILOTTI, | |
| _____ Defendant. _____ | / Superseding Case Information: |

**Court Division:** (Select One)

| | |
|---|---|
| ___ Miami ___ Key West | New Defendant(s)        Yes ___   No ___ |
| ___ FTL __X__ WPB ___ FTP | Number of New Defendants ___ |
| | Total number of counts ___ |

I do hereby certify that:

1.  I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.  I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.  Interpreter:      (Yes or No)      _No_
    List language and/or dialect _____

4.  This case will take __20__ days for the parties to try.

5.  Please check appropriate category and type of offense listed below:
    (Check only one)                                      (Check only one)

| | | | | | |
|---|---|---|---|---|---|
| I | 0 to 5 days | ___ | Petty | ___ |
| II | 6 to 10 days | ___ | Minor | ___ |
| III | 11 to 20 days | __X__ | Misdem. | ___ |
| IV | 21 to 60 days | ___ | Felony | __X__ |
| V | 61 days and over | ___ | | |

6.  Has this case been previously filed in this District Court? (Yes or No)      _No_
    If yes:
    Judge: _____      Case No. _____
    (Attach copy of dispositive order)
    Has a complaint been filed in this matter?      (Yes or No)      _No_
    If yes:
    Magistrate Case No.      _N/A_
    Related Miscellaneous numbers:      _N/A_
    Defendant(s) in federal custody as of      _N/A_
    Defendant(s) in state custody as of      _N/A_
    Rule 20 from the      _N/A_      District of _____

    Is this a potential death penalty case? (Yes or No)      _No_

7.  Does this case originate from a matter pending in the U.S. Attorney's Office prior to
    April 1, 2003? ___ Yes __X__ No

8.  Does this case originate from a matter pending in the U. S. Attorney's Office prior to
    April 1, 1999? ___ Yes __X__ No
    If yes, was it pending in the Central Region? ___ Yes __X__ No

9.  Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office
    prior to October 14, 2003? ___ Yes __X__ No

10. Does this case originate from a matter pending in the Narcotics Section (Miami) prior to
    May 18, 2003? ___ Yes __X__ No

_____
JOHN KASTRENAKES
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No. 312827

*Penalty Sheet(s) attached                                                                 REV.1/14/04

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:** **Anthony R. Masilotti**

**Case No:** *06-80158-CR- Ryskamp/ Hopkins .*

Count #: 1

Conspiracy to commit honest services fraud

18 USC § 371

**\* Max.Penalty:**      5 years' imprisonment; $250,000 fine

Count #:

**\*Max. Penalty:**

Count #:

**\*Max. Penalty:**

Count #

**\*Max. Penalty:**

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

## BOND RECOMMENDATION

## ANTHONY R. MASILOTTI
Defendant.

$200,000 personal surety bond is recommended.

JOHN S. KASTRENAKES
ASSISTANT UNITED STATES ATTORNEY